**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**r2 SALES & CONSULTING,**
**INCORPORATED,**

                                         **Civil Case No. 97-CV-71098-DT**

        **Plaintiff/Counter-Defendant,**

**v.**                                  **HONORABLE DENISE PAGE HOOD**

**MIDISOFT CORPORATION,**

        **Defendant/Counter-Plaintiff.**

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.      INTRODUCTION**

Plaintiff r2 Sales & Consulting, Inc. ("r2") brought this action against Defendant Midisoft Corporation ("Midisoft") claiming breach of a Manufacturer's Representative Agreement by improper termination. Midisoft counterlclaimed that it did not terminate the sales agreement (the "Agreement"), but that the Agreement expired by its own terms and that r2 had submitted multiple invoices in breach of its Agreement with Midisoft. Particularly, r2 claims one count of breach of contract, one count of specific performance/accounting, and one count alleging a violation of the statutory duty of Midisoft to pay all commissions within forty-five (45) days under M.C.L.A. § 600.2961. The Honorable Horace W. Gilmore granted Midisoft's Motion to Dismiss r2's M.C.L.A. § 600.2961 claim in Count III. (Docket No. 15, February 5, 1998 Memorandum Opinion and Order) Midisoft alleged in its Counterclaim: breach of contract; breach of the duty of good faith and fair dealing; offset; and unjust enrichment.

**II.      JURISDICTION**

Jurisdiction in this matter is pursuant to 28 U.S.C. § 1332(a) as there is diversity of citizenship between the parties. Although Defendant claims the requisite amount in controversy is not met, Judge Gilmore previously considered and rejected that claim. (Docket No. 15, February 5, 1998 Memorandum Opinion and Order) The amount in controversy alleged exceeds $75,000.00.

## III.   FINDINGS OF FACT

Plaintiff r2 was a Michigan corporation owned at the time of this lawsuit by Karen Rosenberg and Donna Rayner with its principal place of business located in Oakland County, Michigan. Defendant Midisoft (now recordLab.com) is a Washington corporation with its principal place of business located in Redmond, Washington. As a publicly traded company it is subject to the reporting requirements of the Securities and Exchange Commission. From November 1994 through December 31, 1996, Midisoft sold specialty software products related to the music industry.

In November 1994, r2 and Midisoft entered into a Manufacturer's Representative Agreement signed by Karen Rosenberg for r2 and William Kyle for Midisoft. During the period of the Agreement, r2 acted as an independent sales representative  The Agreement was for an initial term of one year, from November 4, 1994 until November 6, 1995. The parties renewed the Agreement for the period November 5, 1995 until November 6, 1996.

Midisoft's Tom Weiland sent a letter to r2 on September 1, 1996, attempting to modify the Agreement by reducing the commissions paid under the Agreement from 10% to 5%. On September 17, 1996, r2 indicated it was not "comfortable going forward with that piece of paper as our Agreement," that any changes to the current Agreement should be noted and any agreed upon changes would be revised or added to the Agreement. (Plaintiff's Ex. V)

The Agreement provided for termination without cause upon 45-days' notice. On October

2

25, 1996 Midisoft sent written notice that it was terminating the Agreement immediately. (Plaintiff's Ex. W)  Since the Agreement could be terminated without cause upon 45-days' notice, the termination was not effective immediately, but was terminated effective December 9, 1996. Commissions were due under the Agreement on the last day of the month following the close of the previous month. (Agreement, p. 3, ¶ 7)

By the terms of the Agreement, Midisoft was to pay r2 a 10% commission on all "net" sales made to specific customers listed in the Agreement.   Commissions were to be based upon a Net Invoice Price as defined in the Agreement as the total price at which an order is invoiced less returns, freight and price protection credits.  (Agreement, p. 3, ¶ 7)  Midisoft during the course of the Agreement never deducted on the commission reports the rebates, advertising co-op credits, MDF fees or any other credits other than product returns and price protection credits.   The Agreement only provided for returns, freight and price protections as allowed reductions to be considered in reaching the Net Invoice Price.  (Agreement, p. 3, ¶ 7) Midisoft claims, however, that advertising, rebates and marketing funds were to be deducted to determine the Net Invoice Price.

Between December 1995 and October 1996 Midisoft reported and paid commissions to r2 although at times incorrect amounts were paid.  Under the Agreement, Midisoft was to compile commission statements and to pay commission. (Agreement, ¶¶ 7C, 4D)   The Agreement did not require r2 to invoice Midisoft.  Midisoft paid commissions on at least one occasion (a December 1994 sale to Best Buy) when Midisoft did not receive an invoice from r2.

During the course of the relationship Midisoft paid r2 $118,729.76 in commissions.  r2's Revised Damages Summary lists r2 invoices paid by Midisoft in the amount of $117,963.57 (see r2's revised Exhibit KK) but also adopts the Midisoft larger figure of $118,729.76 in paid commissions

set forth in Midisoft's revised Exhibit 24R.   r2 submits adjusted invoices in the amount of $165,178.72 in its revised Exhibit KK, taking into account price protections issued to accounts for Sam's Club and Media Plan.   However, Midisoft, notes the $169,801.75 figure less corrections to the invoices of $1,820.61, for a total of $167,981.14 on its revised Exhibit 24R.

r2 claims that it did not invoice Midisoft for all sales of Midisoft products made prior to the termination of the Agreement, but that Midisoft had the information required to determine the amount of commissions not invoiced.   r2 points to Midisoft's own commission reports to support this argument.   r2 specifically notes that Midisoft attempted to reconcile the amounts owed to r2 in a compilation prepared by Midisoft and sent to r2 around December 19, 1995.   r2 claims the amount of the non-invoiced sales commissions is $20,148.05 and that this amount is due and owing.

r2 argues it is entitled to commissions for sales made to MediaPlay from November 1995 through the end of the Agreement in the amount of $17,963.22, based on Midisoft's own documents submitted at trial.   Part of r2's claim includes commissions from sales made to Micro Center totaling $1,367.40; commissions for sales to AAFES in the amount of $7,724.06; commissions for sales to CompUSA in the amount of $17,506.06, less price protections of $4,589.76; a total of non-invoiced commissions of $64,726.79.

r2 further agrees with Midisoft that, with respect to the account of the Handleman Company, Midisoft should receive two credits reducing the amount owed by $128.97.   However, r2 does not agree with other deductions and price protection credits, claiming duplication or that some price protections were issued to the account which were not r2 accounts or that returns were inaccurately charged against r2 sales.   r2 claims a total amount due and owing of $104,876.16.

Midisoft claims that six of r2's invoices contained errors or were not submitted amounting

4

to $1,820.61 which should be deducted from the total net invoices submitted by r2 for commission. Midisoft also claims that $52,964.76 in credits were not deducted from the amounts paid to r2. In all, Midisoft asserts that r2 was overpaid $3,713.16.

The overpayment of $3,713.16 is based predominantly on a payment to r2 on August 6, 1996, relative to a July 2, 1996 invoice number 2301. As a result of this payment, Midisoft argues that r2 was "in a deficit position", that it owed Midisoft pursuant to the terms of the Agreement. Midisoft specifically relies on Paragraph 7 of the Agreement which allows Midisoft to deduct any overpayment from credits not previously recognized from any amount due to r2.

Midisoft also claims that it had until the end of the month following the month in which a sale was made to pay r2's invoices and therefore also had the right to deduct against those commissions any credits received until the commissions were paid. In this case, Midisoft claims it could make deductions through December 31, 1996 since the Agreement terminated in November 1996. However, since this Court finds that the Agreement did not terminate until 45-days after notice to r2 on October 25, 1996, the contract then terminated on December 9, 1996. Midisoft's claim would then be that deductions could be taken until the last day of January, 1997.

Paragraph 7 of the Agreement provides:

> Commissions are due and payable on the last day of the month following the close of the previous month or receipt to the distributor's sell through report, whichever occurs last. Net Invoice Price shall be the basis upon which commissions are paid. Net Invoice Price shall mean the total price at which an order is invoiced to the customer, less returns, freight or price protection credits. Manufacturer shall deduct from any sums due Representative:

> A.   An amount equal to commissions paid or credited on sales of Manufacturer's products which have since been returned by the customer.

      B.     An amount equivalent to commissions previously paid or credited or advances on commissions.

      C.     Manufacturer will send Representative copies of all commission statements.

(Agreement, p. 3, ¶ 7)

It is clear from the testimony and the voluminous exhibits presented at trial that each party determined the amount owed to r2 in a different manner. r2 is correct in stating that "this case was difficult to try" not only because of the voluminous exhibits and conflicting testimony, but also because the parties reconciled the amounts reported, owed and paid, using different methods. r2, for example, appears to have kept its records by individual account, usually applying payments by Midisoft to the longest outstanding individual account. (Plaintiff's Ex. R) Midisoft, on the other hand, applied its payments and deductions against totals regardless of the account, although some of its checks for commissions reflect particular invoices. (Defendant's Exs. 3, 21)

Midisoft's claims for returns and reductions are inconsistent, especially where the returns were non-customer specific. Although r2, through its witness Ms. Rosenberg, admitted that some of Midisoft's returns and reductions were accurate, each party in certain instances attempted to support its claims by estimating the amount of an invoice or return, sometimes supported by documents and sometimes by inference. The Court finds there are credibility questions on each side based on the juggling of the documents and inconsistent testimony of both parties' witnesses. Although Midisoft continuously criticizes Ms. Rosenberg's testimony, weighing all of the evidence and the testimony presented at trial, the Court cannot completely discredit Ms. Rosenberg's testimony, in light of the inconsistent documentation and testimonies presented at trial by both parties.

## IV.   CONCLUSIONS OF LAW

6

### A.    Applicable Law

The parties agree the Agreement is governed by Washington state law.  A choice of law provision agreed to by parties to a contract will be upheld unless determined to be unreasonable. *Voicecheck Data Services, Inc. v. Data Pulse, Inc.*, 86 Wash. App. 613, 616 n.1 (1997).

### B.    Termination of Agreement

The clear and ambiguous language of a contract must be enforced.  A court may not modify the clear and ambiguous language of such a contract.  *McDonald v. State Farm Fire and Casualty Insurance Co.,* 119 Wash. 2d 724, 733 (1992).  r2 and Midisoft had a contract, the Agreement which commenced on November 7, 1994, and was "mutually renewable at twelve month intervals." (Agreement, p. 3, ¶ 11)  The Agreement could be terminated without cause with 45-days' written notice by registered or certified mail.  Based on this unambiguous language, the Court finds that the Agreement between the parties continued until 45-days after the termination letter sent by Midisoft dated October 25, 1996.  The Agreement therefore terminated on December 9, 1996.

### C.    Modification of Agreement

On September 1, 1996, Midisoft, by letter of Tom Weiland, requested r2 accept a reduced commission rate of 5%.  The Agreement clearly provides a commission rate of 10%.  (Agreement, p. 2, ¶ 6) The Agreement further provides that the Agreement may not be modified without the written consent of both parties.  (Agreement, p. 4, ¶ 13)  One party to a contract may not unilaterally modify a contract.  Modification requires a "meeting of the minds, mutual assent."  *Jones v. Best*, 134 Wash. 2d 232, 240 (1998). Other than both parties' continued performance under the Agreement there is no indication, written or otherwise, that r2 agreed to the modification of the reduction of the commission rate of 5%.  r2's continued performance does not constitute mutual assent.  Midisoft

7

admits that no new written agreement replaces the original Agreement.  Midisoft also notes that r2's response to Weiland indicated that r2 did not feel comfortable going forward on the basis of the September 1, 1996 letter from Weiland and wanted a more formal agreement to memorialize the parties' agreement.  Even though r2 does not expressly reject Weiland's proposal, the Court finds there is no meeting of the minds nor a written consent signed by both parties as required by the Agreement with respect to the reduction of commissions from 10% to 5%.  The 10% commission rate continued to apply after Weiland's September 1, 1996 letter until the termination of the Agreement.

### D.      Breach of Contract

#### 1.      Interpretation of Contracts

Courts should not read a contract giving it forced or strained meanings, but must read each contract as an average person would.  *Mid-Century Insurance Co. v. Henault*, 128 Wash. 2d 207 (1995).  The language and words in a contract are to be given their ordinary meaning. *Martinez v. Miller Industries*, 94 Wash. App. 935, 944 (1999).  Clear and unambiguous language  in a contract must be enforced as written and not modified by a court.  *McDonald v. State Farm Fire and Casualty Insurance Co.*, 119 Wash. 2d 724, 733 (1992).  If an ambiguity exists in a contract the language will be construed against the maker who drafted the document. *Jones Associates, Inc. v. Eastside Properties, Inc.,* 41 Wash. App. 462, 467 (1985).

Ms. Rosenberg testified that r2 has a boilerplate manufacturer representative agreement but the Agreement signed by the parties was not r2's boilerplate agreement.  She stated that Midisoft wanted to use its own forms so Midisoft prepared the Agreement, using some of the language in r2's boilerplate agreement.  No questions were asked of Ms. Rosenberg by either party as to which

language of the signed Agreement was based on r2's boilerplate agreement.  Midisoft did not present

any testimony to rebut Ms. Rosenberg's testimony as to which party drafted the Agreement.  Based

on Ms. Rosenberg's testimony, it appears that Midisoft was the drafter of the Agreement and any

ambiguities in the contract will be construed against Midisoft.

### 2.    Documentation

The Agreement provides that upon acceptance of an order Midisoft was responsible for credit

risks and collections.  (Agreement, p. 3, ¶ 8)  Commissions paid to r2 could not be reduced if an

order accepted by a customer or distributor was not paid.  The Agreement did not require r2 to

provide an invoice from r2 to Midisoft for r2 to receive payment of a commission by Midisoft.

Midisoft was required to provide commission statements to r2 and these commissions were based

on sales made to r2 accounts. (Agreement, p. 3, ¶ 7.C.)  r2 was not required to provide purchase

orders to Midisoft for each sale, but the Agreement provided that r2 was to provide such purchase

orders "as appropriate."  (Agreement p. 2, ¶ 5.I.)

In a letter dated December 8, 1995, Midisoft assumed full responsibility for the lack of

"relevant information" on sales and on returns.  The Court finds that this letter indicates Midisoft

recognized that r2 had fulfilled its information obligation under the Agreement.  Midisoft had

sufficient information to ship each order for which r2 now seeks commissions based on information

from r2, the customer, or the distributor.

Part of the difficulty with this case is the manner in which each party kept its records.

Midisoft claims to have audited records, but that does nothing to reduce the confusion caused by

each side keeping records in a different manner.  r2 claims to have documented credits on each

account for its own record keeping.  Midisoft, on the other hand, documented credits and returns

against future commissions, not an unreasonable method of accounting for their purposes.  r2, following Midisoft's presentation at trial, attempted to use Midisoft's accounting method to further its explanation of its claims.  Further complicating the ability to accurately account for commissions is the crediting of returns through Tech Data which did not provide specific customer return information and the attempt of Midisoft to estimate some returns.

### 3.    Invoices

As stated earlier, there is no dispute that Midisoft paid r2 $118,729.76 in commissions. Midisoft claims that these amounts were accounted for by 77 invoices submitted by r2, one of which #2301 invoiced commissonable sales which had previously been submitted.  Midisoft claims that these along with a sale in the amount of $584.83 that was never invoiced, the net amount of all invoices equals, $169,801.75.  (Defendant's revised Ex. 24R)  r2 indicates a total amount of invoices, paid and not paid, in the amount of $165,178.72 (Plaintiff's revised Ex. KK)

Midisoft also claims there are invoices that have errors amounting to $1,820.61, specifically: #2302 in the amount of $206.30, dated 7/12/96; #2302 also dated 7/12/96 for $431.76; #2304 for $22.55; #2323 for $172.70 and #2346 for $487.50.  In these instances, Midisoft claims it never billed the customer for these sales, no purchase orders exist and no evidence exists that such a sale was made.  In addition, Midisoft claims that #2328 was a duplicate of a previous invoice.  Midisoft argues that r2 was obligated to provide purchase orders or other "sell through" information in order to receive commissions.  Two purchase orders were thereafter submitted by r2 to reflect these sales but there is no corresponding invoice or purchase order from Midisoft to the customer that reflects the sale.

### 4.    Software, Etc. And Babbages

10

Midisoft contends that r2 failed to recognize certain credits that should have been deducted from commissions paid to r2. Midisoft claims that each of these credits is supported by a credit memo or a return authorization form. r2 and Midisoft agree that Tech Data and Ingram did not supply customer specific information. Midisoft also claims a return from Software, Etc., in the amount of $34,528.41 as evidenced by a letter of September 21, 1995 to Neostar that certain products were "on hand" and would be returned pursuant to a credit memo. (Plaintiff's Ex. R) Midisoft claims that Tech Data and Ingram did supply specific data related to Software, Etc. Midisoft admits that it does not have a specific return authorization in the specific amount of $34,528.41, claiming such a document would not be created, but does have a letter from r2 identifying this return. Ms. Rosenberg admitted she expected some but not all of the product would be returned and that Midisoft upgraded its computer products with a new version. Ms. Rosenberg claimed to have asked for documentation about this return which was not received. Midisoft argues that because r2 admitted that Midisoft upgraded its computer products and because r2 admits it expected to return some of the product, that it is "consistent" that the old product would be returned. Midisoft further argues that Ms. Rosenberg did not actually ask for documentation.

A return from Software, Etc. in the amount of $34,052.85 is reflected on a letter dated September 21, 1995 from r2 to Bob McKenzie of Neostar. (Plaintiff's Ex. R; r2 Reply Br., Ex. B) This letter indicates Software, Etc.'s intent to make a return. It is further reflected on an October 10, 1995 memorandum from Pete Eastman to Bill Kyle also noting an intent to return and on a Midisoft r2 Sales Consulting Neostar Commission Recap report under the "Return Detail" heading ($32,084.60). (r2 Reply Br., Ex. C)

Midisoft also claims a $32,084.60 return (see Midisoft's exhibit 3) returned from Babbages

11

through Ingram.  There is no specific documentation regarding this return.  Midisoft argues that this deduction is reflected in the matrix provided on December 4, 1995 and December 19, 1995 and on a reconciliation dated January 1996.  Midisoft claims a check in the amount of $8,913.80 was issued as a final reconciliation of all outstanding 1995 invoices and included this deduction.  Midisoft claims that r2 cashed this check and never objected to the deduction and therefore the Court should find the reconciliation was accepted and satisfied all the parties at the time, and that the return from Babbages was thereby accepted by r2 and properly credited.

The Court finds that this one return, the amount of the Babbages, is exactly the amount of the Software, Etc. return.  The Recap reports the same exact items listed in the September 21, 1995 letter.  The Babbages return is a duplication.  The differences in the amount of the returns may be a price variance.  The Court finds a return from Software, Etc. may be inferred from the reconciliation and Recap reports.

### 5.      Tech Data, Ingram and MicroCenter

Midisoft offered an estimation of returns from Tech Data and Ingram based on comparing the total sales of Tech Data and Ingram for a year to total returns and deriving a percentage, then applying that percentage to sales made by r2 to the customers of Tech Data and Ingram.  During trial, the Court rejected Midisoft's estimation of returns from Ingram and MicroCenter.

### 6.      Sam's Club

Midisoft maintains that r2 failed to account for certain deductions Midisoft was required to take. Midisoft claims a $35,000 price protection from Sam's Club.  (Credit memo in Exhibit 26) Although r2 asserted that invoice #2099 dated 7/6/95 was a net invoice, the price protection credit memo is dated October 9,1995, so that #2099 could not have been a net invoice and Midisoft should

receive credit for this amount. In fact, r2 subsequently included this price protection in its Exhibit KK, deducting it from the gross invoices submitted.  The Court finds the evidence supports a credit against r2 for the Sam's Club price protection.

### 7.    Invoice #2301

Midisoft challenges over and over again the accounting method employed by r2. Specifically, Midisoft asserts that r2 rebilled various invoices on invoice #2301 (which Midisoft claims it paid with Check No. 21368 for $24,718.49). One of these rebilled invoices, #2221 in the amount $1,415.13, is claimed to be from Barnes and Noble, even though Midisoft argues that Barnes and Noble purchased through Ingram which did not provide customer specific information.  Midisoft claims r2 admitted there was no documentation regarding this sale.

Again criticizing the accounting methods used by r2, Midisoft claims that r2 took advantage of the departure of a Midisoft employee to challenge reconciliations prepared by that employee and rebill via Invoice #2301.  The Court recognizes that r2 did not systematically adhere to its claimed practices of crediting the oldest invoice.  The accounting procedures used by Midisoft are different and the documentation or lack thereof for certain deductions, returns and price protections is less than adequate to establish same with certainty.  Although Midisoft claims that invoice #2301 rebilled invoices numbered 2068, 2219, 2221, 2222, 2223, 2224, 2248, 2252 and 2269, Midisoft did not dispute r2's claim at that time that these invoices were unpaid when it issued the check noting invoice #2301.  (Defendant's Ex. 31B) Midisoft did not submit any checks or documentation indicating these specific invoices were previously paid.

### 8.    Navarre

Midisoft highlights the Navarre returns in the amount of $16,023.00 as the "most glaring

13

example" of r2's attempt to "mislead and confuse the court". Midisoft claims that the January 1996 reconciliation (Plaintiff's Ex. S) matrix notes a $16,023.50 and increases commissions paid to r2 by $1,602.30. Midisoft claims this amount was paid by a check (20046) issued in the amount of $1,853.52, covering not only the $1,602.30 but also $251.21 for an AAFES sale. r2 did not adequately respond to Midisoft and the Court finds that $1,602.30 was previously accounted for.

### 9.    Neostar

Midisoft next claims a price protection of $33,434.88 related to Neostar. This price protection involved invoices numbered 2224 and 2225 by which Midisoft claimed to have properly taken price protections of $6,682.50 and $8,977.50 respectively. Midisoft compared the gross amount of these invoices and the product sold to the net amount of the unit price at which the product was sold to Babbages and Software, Etc. Midisoft claims r2's commission summary of 12/4/95, supports its position. r2 claims to have had questions about the prices at which Midisoft was selling the product and whether there existed possible anti-trust violations.

### 10.    CompUSA

Midisoft also used the same r2 commission summary to demonstrate that it had properly taken price protections related to CompUSA and deducted $2,092.50 from invoice #2223. Midisoft claims this was a simple mathematical computation.

### 11.    Media Play

Midisoft claims that r2's allegations regarding sales to Media Play in November and December of 1995 is without merit because those sales are based on speculation by Ms. Rosenberg of r2. Initially, r2 estimated those sales at $12,000.00 worth of commissions. Later in the trial, based on Midisoft's accounting, r2 asserted those sales were approximately $18,000.00 worth of

14

commissions, claiming the sales Midisoft indicated were Babbages were actually Media Play sales. However, Midisoft contends that the $180,000.00 in sales were invoiced by r2 as Babbages sales. r2 did not have any documentation regarding these sales.  Marsha Murry of Midisoft testified there was no documentation for sales to Media Play after October 1995.  Ms. Rosenberg admitted there was no documentation but challenged whether there were *no* sales during the holiday period.

### 12.    May 1996 through August 1996

Midisoft then claims that r2 changed its approach during trial.  In effect, r2 attempted to use an approach similar to that of Midisoft through Exhibit KK to demonstrate its claims.  As noted before, Midisoft claims that on Exhibit KK r2 reduces the gross invoices instead of recognizing  the Sam's Club deduction.  Midisoft also asserts that invoices r2 claims were unpaid were in fact paid by check no. 20861 on May 16, 1996 in the amount of $18,313.80.  Specifically, Midisoft refers to invoices nos. 2254, 2274, 2276, 2277, 2278, 2279, 2311, 2312, 2313, 2315, 2316, 2317.  Midisoft contends that these are only listed as outstanding because of r2's accounting practice of the application of Midisoft checks to outstanding invoices. With respect to the balance of r2's alleged unpaid invoices, Midisoft claims those should not be paid because by that time r2 was in a credit situation with respect to Midisoft; by then Midisoft claims it had overpaid r2.  Midisoft also contends that r2 should not have been paid any commission beyond August 6, 1996.  The Court rejects this argument as it is based on conflicting methods of accounting for the application of commissions to invoices.

### 13.    Commissions After Notice of Termination

Midisoft also argues that even if the contract ended on December 9, 1996, as this Court has

15

found, no invoices were ever received for sales made after November 1996 and Midisoft owes no

commissions to r2 for November sales; in fact, Midisoft claims r2 made no sales after October 26,

1996.  Midisoft claims the only sales r2 might look to were commissions offered by way of

settlement of the case on sales to certain customers.  Midisoft asserts these commissions, if required

to be paid, should be paid at the 5% commission rate.  The Court rejects this argument based on its

finding that the termination date is December 9, 1996 and that commissions be paid at the 10% rate.

The Court finds that the "aging receivables" document submitted by Midisoft cannot provide

a basis for calculating commissions.  The Court agrees this cannot be used to accurately support a

claim for commissions.

### 14.    Price Protections and Rebates

The Court also finds that "rebates" are not defined as either "price protections" or "returns"

under the Agreement between the parties. While the testimony of Midisoft's Ms. Murry was that

based on her twenty years experience that a rebate is always considered a form of price protection,

the Agreement just does not speak to rebates.  The testimony was that a price protection protects

profit margin. Midisoft argues that a rebate is a credit which also protects the profit margin.  r2, on

the other hand, insists that rebates constitute marketing and that Ms. Rosenberg specifically rejected

the inclusion of rebates in the Agreement. Midisoft challenges whether Ms. Rosenberg could recall

the subject of negotiations which had taken place six years prior.

The Court finds there is significant dispute about whether rebates were to be considered price

protections and further finds that if Midisoft believed, based on experience, that rebates were price

protections, rebates (as a credit or price protection) should have been specifically included in the

Agreement.  The term "price protections" is not defined to include the term "rebates."  The term

"price protection" is not expressly defined in the Agreement and Midisoft has not sufficiently shown

that the term "price protections" includes "rebates."   Any ambiguities in a contract is construed

against Midisoft, the drafter of the Agreement.  *See, Jones Associates,* 41 Wash. App. At 467.  The

Court finds that "rebates" are not "price protections" as set forth in the Agreement.

### E.      Damages

The Court has weighed the testimony of the witnesses and the documentation presented to

the Court.   On both sides, the procedures for documenting sales, determining commissions and

accounting for returns and price protections was inadequate for the determinations the Court was

required to make.  The Court however, finds in favor of the claims of the Plaintiff r2 as reflected in

this Opinion and that Defendant Midisoft breached the Agreement by failing to pay certain

commissions to r2.  The Court further finds against the Defendant Midisoft on its Counterclaim for

overpayment, breach of duty of good faith and fair dealing, offset and unjust enrichment, although

the Court has found in Defendant's favor with regard to a few returns and price protections.

The Court finds that r2 the total paid invoices is $165,178.72 as calculated on r2's Revised

Damages Summary.  (Plaintiff's Ex. revised KK)  Midisoft is entitled to a reduction to this amount

for corrections to invoices of $1,820.61 as reflected in Midisoft's Audit Summary (Defendant's Ex.

24R), leaving the total paid invoices at $163,358.11.   r2 shall recover the r2 orders not invoiced as

reflected on r2's Revised Damages Summary except for 1996 MicroCenter which was based on the

Midisoft aged receivables report, for a total orders not invoiced in the amount of $63,369.39.  The

Court finds the aged receivables report is not an accurate report from which to extrapolate orders

upon which to base commissions.  The amount of commissions is $217,629.44.

The commissions shall be reduced by credits from Handleman, Navarre, Merisel and Tech

Data as listed on r2's Revised Damages Summary as well as the Software, Etc. return in the amount

of $3,208.47.  Certain Navarre credits, MicroCenter credits, Merisel credits, Tech Data credits and

Ingram credits are not included as the Court finds they are not fully supported or cannot be properly

designated r2 returns or price protections or constitute rebates not allowed under the Agreement.

The Handleman write off ($692.28) for failure to collect cannot be assessed against r2 pursuant to

the Agreement.  (Agreement, p. 3, ¶ 8)  The court further finds that Midisoft previously paid

$118,729.76 in total payments to r2.  r2's total damages awarded are $98,899.68, plus any applicable

statutory interest and costs, as follows:

|  |  |  |
|---|---|---|
| r2 invoices submitted: | $ | 165,178.72 |
| Less corrections to invoices: | $ | 1,820.61 - |
| **Total r2 invoices submitted:** | **$** | **163,358.11** |
| Total r2 invoices submitted: | $ | 163,358.11 |
| r2 invoices not submitted: | $ | 63,359.39 + |
| **Total r2 invoices:** | **$** | **226,717.50** |
| Total r2 invoices: | $ | 226,717.50 |
| Less credits: | $ | 9,088.06 - |
| **Total commissions** | **$** | **217,629.44** |
| Total commissions | $ | 217,629.44 |
| Less commissions paid by Midisoft: | $ | 118,727.76 - |
| **Total commissions unpaid due to r2:** | **$** | **98,899.68** |

###### E.      Accounting

Count II of the Complaint asserts a claim for accounting for sales to CompUSA from 11/7/94 to 9/30/95 and sales to Best Buy through Merisel.  Midisoft did not address the accounting claim in its Summation, its Proposed Findings of Fact and Conclusions of Law or its Reply to r2's Proposed Findings of Fact and Conclusions of Law.  The Court finds that Midisoft has failed to provide sufficient evidence regarding the sales to CompUSA and Best Buy through Merisel during this period.  An accounting is an equitable relief to which a party is entitled where the balance is uncertain and the true amount owed must be ascertained.  *Webster v. South Seattle Land Co.,* 174 Wash. 276 (1933).  The Court grants r2's request for an accounting.

## V.      ORDER

For the reasons set forth above, judgment shall be entered in favor of Plaintiff r2 and against Defendant Midisoft in the amount of $98,899.68 plus applicable interest and costs and for an accounting for sales to CompUSA from 11/7/94 to 9/30/95 and sales to Best Buy through Merisel.


     */s/ DENISE PAGE HOOD*
DENISE PAGE HOOD
United States District Judge

DATED: October 18, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 18, 2006, by electronic and/or ordinary mail.

s/William F. Lewis
Case Manager

19